STATE OF NORTH CAROLINA v. PAMELA SANDERS LANIER

No. COA03-476

(Filed 20 July 2004)

**1. Evidence— prior crimes or bad acts—death of former husband—absence of accident—doctrine of chances—remoteness—motive**

The trial court did not abuse its discretion in a first-degree murder case by denying defendant's motion in limine to prevent the State from offering evidence concerning the death of defendant's former husband by drowning six years prior to the death of her second husband by arsenic poisoning, because: (1) although defendant contends that both men died as the result of an accident, both men suddenly and inexplicably became seriously ill while sharing a home with defendant after experiencing no major medical problems; (2) both men experienced a change in personality, described by their respective friends and family members as being in a stupor or acting like a zombie; (3) when both men became ill, defendant diagnosed their medical problems and treated the men herself; (4) defendant attempted to isolate both men and generally refused to get them professional medical assistance on a regular basis; (5) defendant reaped a substantial financial benefit from the untimely deaths of both her husbands; (6) although the two men died from different causes, the circumstances surrounding the first husband's death are relevant to the argument that the death of the second husband was not accidental according to the doctrine of chances; (7) remoteness in time does not affect the probative value of the death of the first husband regarding absence of accident, and the similarities between the two deaths are not less probative due to the passage of time; (8) evidence of defendant's financial gain following the deaths of both of her husbands provided a motive for her involvement in their deaths; and (9) the evidence pertaining to the husbands' financial status, coupled with the mysterious illnesses of both men and the similarities between the two deaths, rendered the evidence of the first husband relevant to prove something other than defendant's propensity to commit murder.

2. **Evidence— exclusion—cause of death of first husband— invited error**

The trial court did not abuse its discretion in a first-degree murder case by excluding evidence about the cause of the death of defendant's first husband in order to differentiate the death of her second husband, because: (1) a defendant is not prejudiced by the granting of relief which he has sought or by error resulting from his own conduct; and (2) even if the exclusion of this evidence during a doctor's cross-examination had been error, defendant had the opportunity to present the arsenic evidence during her case-in-chief but chose to request its exclusion instead.

3. **Evidence— fire—beneficial financial impact**

The trial court did not abuse its discretion in a first-degree murder case by admitting evidence regarding a fire at a home defendant shared with the victim husband, because: (1) although defendant objected to the presentation of this evidence during the testimony of one witness, two other witnesses had already testified concerning the fire without objection by defendant, and the admission of evidence without objection waives prior or subsequent objection to the admission of evidence of a similar character; (2) the evidence discussing the beneficial impact of the fire on the couple's finances, along with the evidence of the death of defendant's first husband, strengthens the application of the doctrine of chances and lessens the probability that the second husband's death occurred as an accident; (3) the chain of events before the victim's death forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury; and (4) even if the evidence was admitted in error, defendant failed to show how it prejudiced her given the voluminous amount of evidence and testimony presented during the trial.

4. **Evidence— witness—impeachment—waiver**

The trial court did not err in a first-degree murder case by allowing the State to impeach its own witness, because: (1) there was no indication that the State's impeachment was used as a mere subterfuge to present improper evidence to the jury; (2) the State impeached the witness's credibility by comparing his testimony to representations he made on the pertinent insurance application; and (3) defendant waived any error since the appli-

cation for insurance had been admitted into evidence and the witness had given most of his testimony before defendant objected to the State's impeachment of him.

**5. Homicide— first-degree-murder—requested instruction—accidental death**

The trial court did not err in a first-degree murder case by failing to give defendant's requested jury instruction on the theory of accidental death, because: (1) the trial court's instruction on accident was a correct statement of the law and contained the substance of the instruction defendant requested; and (2) defendant failed to show that had the jury been instructed as she suggested, there is a reasonable probability that the outcome of her trial would have been different.

**6. Homicide— short-form indictment—murder by poison**

The short-form indictment used to charge defendant with first-degree murder was sufficient to support a conviction of defendant for murder by poison under N.C.G.S. § 14-17.

Appeal by defendant from judgment entered 29 November 2001 by Judge Carl L. Tilghman in Wayne County Superior Court. Heard in the Court of Appeals 19 April 2004.

*Attorney General Roy Cooper, by Norma S. Harrell, Special Deputy Attorney General, for the State.*

*Rudolf, Maher, Widenhouse & Fialko, by M. Gordon Widenhouse, Jr., for defendant-appellant.*

MARTIN, Chief Judge.

Defendant Pamela Sanders Lanier appeals from a judgment imposing a sentence of life imprisonment without parole entered upon her conviction by a jury for the first-degree murder of her husband, Ivy Dorian Lanier (Dorian). The jury found that she was guilty of first degree murder both on the basis of premeditation and deliberation and murder by poison.

Summarized only to the extent required to discuss the assignments of error brought forward on appeal, the evidence presented at defendant's trial tended to show that she and Dorian Lanier were married in 1993 and lived near Chinquapin. Dorian and defendant had a contract to grow turkeys for Nash Johnson and Son Farms. Dorian

used a turkey medication called Nitro-3 on his turkeys, which was administered through the turkeys' water supply. Dorian had a proportional medication system between his house and his turkey houses, where Nitro-3 was mixed with water in a bucket called a proportioner; the mixture then ran through a water hose to the turkey house. The hose had a bypass valve that allowed one to draw fresh water, without Nitro-3, out of the hose. Nitro-3 contains arsenic and stains yellow any object with which it comes in contact.

The evidence showed that Dorian hurt his leg while operating his bulldozer the first week in September 1997, after which his health began to decline, and his behavior changed as well. Alli Bradshaw ("Bradshaw"), a family friend, testified that she lived with defendant and Dorian from September until 4 November 1997. Bradshaw testified that during that period, Dorian was frequently bedridden and delirious, lying in his bed naked. On other occasions, Dorian sat in his recliner and was too weak to cross his legs. Bradshaw described one incident when Dorian was bedridden for three days, unable to move or talk and had soiled the bed. Dorian ate only melted ice cream during this period, which defendant fed him from her fingers. On another occasion in late September, Dorian returned home and fell out of his truck onto the driveway where he lay, "acting like a zombie." Dorian had diarrhea and "messed up his pants" before defendant could get him inside the house.

Several witnesses testified that defendant tried to prevent family and friends from seeing Dorian while he was ill. Defendant became furious when anyone asked her to take Dorian to the doctor, even though he was ill and was not eating. Numerous witnesses documented that Dorian did not like doctors and did not want to go to the doctor, relying instead on defendant to "doctor" him. Defendant often opened up capsules which she said were antibiotics and poured them into Dorian's soft drinks; she also administered injections of Phenergan and Nubain. Phenergan is used to reduce nausea and vomiting; Nubain is a painkiller, sufficient quantities of which will put a person into a stupor. Despite his illness, Dorian received professional medical care only sporadically between September and his death in November.

The evidence also showed that defendant suffered from numerous medical problems in 1997, including migraine headaches. She had sores on her buttocks, which she thought were shingles, and frequently showed the sores to other people. As a result of her illnesses, defendant used a lot of medication, including Nubain and Phenergan.

STATE v. LANIER

[165 N.C. App. 337 (2004)]

Over a four-year period ending in 1998, defendant purchased over $10,000 worth of prescription medication from the Kenansville Drug Store. She also went to an urgent care clinic as often as three days each week to get shots of Phenergan and Nubain until January 1997. Defendant had no insurance to cover her medical expenses.

Dr. Richard Jordan first treated Dorian on 14 September 1997, when Dorian complained of a bitter taste in his mouth. When Dorian came in for an office visit on 27 September 1997 he was delirious and sick. Despite his declining health, Dorian Lanier did not see a doctor until 13 November 1997. During this doctor's appointment on 13 November 1997, Dorian was in terrible pain and his cognitive function was impaired. Defendant stated that she had been giving Dorian injections of Phenergan, which the nurse instructed defendant to stop doing so that an upcoming diagnostic test would give accurate results. Despite this advice, defendant continued giving Dorian injections of Phenergan.

Dorian saw Dr. Jordan on 17 November 1997 with symptoms of nausea, diarrhea and vomiting. He had lost 21 pounds since his office visit on 27 September. Dorian was disoriented and could hardly walk or talk. Dr. Jordan instructed defendant to take Dorian to the emergency room immediately because he thought Dorian was on the verge of death. Defendant took Dorian to the emergency room, but did not stay for treatment.

Because Dorian's condition was worsening, he was unable to complete the diagnostic test scheduled for 18 November 1997. Defendant called the doctor's office on 19 November and stated that Dorian was nauseated, moaning in pain and vomiting. Defendant did not follow instructions to take Dorian Lanier to the emergency room immediately and continued to care for him at home.

Jackie Hatcher, a family friend, visited Dorian on the afternoon of 19 November 1997, to find him "wobbling" with orange skin. Hatcher insisted on taking him to the hospital and went to find help to carry Dorian to his truck. Defendant was preparing Pedialyte for Dorian to drink and checking his blood pressure. When Hatcher returned to the house, Dorian had a seizure and Hatcher told defendant to call 911.

Dorian arrived at the emergency room by ambulance at 6:25 p.m. He was vomiting, weak, and his skin looked orange. After a short time, Dorian began vomiting undigested food and a red liquid that

smelled like alcohol. Efforts to resuscitate Dorian were unsuccessful and he died at 10:57 p.m.

Dr. Charles Garrett performed an autopsy on Dorian Lanier. Dorian's body was completely yellow, his liver had failed, his heart was enlarged and there was excessive fluid in his lungs. Dr. Garrett found no measurable amount of alcohol in Dorian Lanier's body, but there were traces of over the counter medicine and Phenergan. In Dr. Garrett's opinion, Dorian died of chronic and acute arsenic poisoning. According to the medical expert witnesses, the most common symptoms of arsenic poisoning are abdominal pain, weight loss, nausea, vomiting, diarrhea, a metallic taste in the mouth, jaundice, low blood pressure, stupor, disorientation and weakness in the limbs.

After Dorian died, defendant sold his bulldozer and several tractors for a total of approximately $21,000. Defendant also sold an option to purchase Dorian's land in Duplin County for $225,000.

Witnesses for the defense, including defendant's son Dustin Williams and her nephew Mitchell Sanders, who both lived in the home, testified that Dorian frequently took unidentified pills and had eaten fly bait and rat poison before his death. Although Dorian knew the turkey medication contained arsenic, several defense witnesses, including defendant's son, nephew, mother, father and a family friend, testified that they had seen Dorian drink from the hose attached to the turkey medication. Defendants's son, defendant's father and an EMT testified that Dorian told them at the hospital on 19 November "he had done [this] to himself."

Defendant brings forward on appeal six of the twenty-three assignments of error contained in the record on appeal. The remaining assignments of error are deemed abandoned. N.C. R. App. P. 28(a).

I.

[1] Defendant contends the trial court erred by denying her motion in limine to prevent the State from offering evidence concerning the death of Johnny Ray Williams, defendant's former husband. Such evidence tended to show that defendant married Johnny Ray Williams (Williams) in 1989. He became ill during the summer of 1991. On 18 August 1991, Williams called his mother Marie Williams and told her that he would visit her the following day. Williams told his mother they needed to discuss the farm that they owned together, which was

being foreclosed upon by the bank. Williams did not keep his appointment with Marie Williams on 19 August 1991; defendant called her the following day to inform her Williams was in the hospital. When Williams was hospitalized, he was confused and had trouble speaking. When Marie Williams visited her son, he was initially non-responsive and unable to communicate, but eventually sat up and talked during her visit. His doctors were unable to determine the cause of his illness.

The evidence also tended to show that on another occasion during the summer of 1991, Williams was observed to be sick and almost unconscious at his home. Defendant stated that he had "the DTs" but instead of seeking medical attention for him, she tried to pour liquor in his mouth.

On 4 September 1991, Williams went to the doctor, arriving in the office at 2:20 p.m. According to defendant, after Williams returned home from the doctor's appointment, he took 5 Lorazepam (Valium) pills, his blood pressure medicine (Tenormin), Benedryl and drank one-third of a 1.75 liter (fifth) of Seagram's. Williams walked outside to check his crab pots around midnight with a glass of liquor in his hand. Johnny Williams fell into the water beside his dock, where he drowned. The investigating police officer testified he arrived and found that Williams was below the surface of the water, which was not higher than 3 to 4 feet where Williams fell in. Johnny Williams was known to be an excellent swimmer. Williams' neurologist opined that even if Williams had taken all the medication and had drunk as much alcohol as defendant claimed, he should still have been able to avoid drowning.

The official cause of Johnny Ray Williams's death was listed as drowning. A toxicology screen indicated no measurable trace of alcohol in his system at the time of death, nor was there any prescription medication. The State's expert witness, Dr. Garrett, opined that some alcohol would have appeared on the blood test if Williams had consumed as much alcohol as defendant claimed.

After Williams' death, defendant collected $25,000 as payment on a life insurance policy she purchased in spring of 1991. Defendant received the farm and $5,190.12 from the credit life insurance policy securing the deed of trust on the farm. Defendant eventually sold the farm for $30,000.

Defendant argues that none of this evidence should have been admitted because the circumstances of Williams' death were not sim-

ilar to Dorian Lanier's death; almost seven years had passed between the two deaths; and Williams' death was not relevant to any fact at issue in the case. She contends the introduction of this testimony served only to inflame and confuse the jury, and its erroneous admission entitles her to a new trial.

Rule of Evidence 404(b) states, in pertinent part:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C. Gen. Stat. § 8C-1, Rule 404(b). Even if evidence is admissible according to Rule 404(b), it must also be scrutinized under Rule 403, which provides for the exclusion of otherwise admissible evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403.

Here, the trial court found the following similarities between the deaths of Johnny Ray Williams and Ivy Dorian Lanier:

1. Both men were married to the Defendant at the time of their death.

2. Prior to their death, both men became incapacitated to an unconscious state or stupor at various times preceding their death.

3. The Defendant was the only person able to care for each man and to seek medical attention when they were unable to help themselves.

4. The Defendant was present and had the ability to assist both men in getting medical help and did in fact seek medical help for each on some occasions before their death but only after being urged by others.

5. The Defendant benefitted financially from the death of Johnny Ray Williams and was in position to benefit financially from the death of Ivy Dorian Lanier.

6. In both cases when witnesses were present to see her husbands when they obviously appeared critically ill, the

Defendant appeared to minimize the seriousness of her husbands' illnesses and attempted to treat them on her own.

As a result of these findings, the trial court found that the evidence regarding defendant's marriage to Williams, their financial matters, and the circumstances of Williams' death was admissible evidence, "probative of the issues of motive, intent, plan, opportunity, and absence of accident[.]" The trial court found that the probative value of the Williams evidence was not outweighed by the danger of unfair prejudice and that the time interval between the two deaths was not so remote as to affect the probative value of the Williams evidence. Defendant contends the trial court's findings were not supported by the evidence, because Johnny Williams and Dorian Lanier did not die under similar circumstances.

Rule 404(b) is "a clear general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990) (emphasis in original); *cert. denied*, 421 S.E.2d 360 (1992). "When prior incidents are offered for a proper purpose, the ultimate test of admissibility is whether they are sufficiently similar and not so remote as to run afoul of the balancing test between probative value and prejudicial effect set out in Rule 403." *State v. West*, 103 N.C. App. 1, 9, 404 S.E.2d 191, 197 (1991). "In each case, the burden is on the defendant to show that there was no proper purpose for which the evidence could be admitted." *State v. Williams*, 156 N.C. App. 661, 664, 577 S.E.2d 143, 145 (2003) (quoting *State v. Willis*, 136 N.C. App. 820, 823, 526 S.E.2d 191, 193 (2000)). "The determination of whether relevant evidence should be excluded under Rule 403 is a matter that is left in the sound discretion of the trial court, and the trial court can be reversed only upon a showing of abuse of discretion." *State v. Hipps*, 348 N.C. 377, 405-06, 501 S.E.2d 625, 642 (1998), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 114 (1999).

Here, the trial court allowed admission of the Williams evidence as probative for several purposes: to show defendant's motive, intent, plan, opportunity and absence of accident. "[W]here . . . an accident is alleged, evidence of similar acts is more probative than in cases in which an accident is not alleged." *State v. Lloyd*, 354 N.C. 76, 89, 552 S.E.2d 596, 608 (2001) (citation omitted). "Where a defendant claims accident, a prior bad act with a 'concurrence of common features' to

the crime charged, tends to negate a defendant's contention that he 'had no plan to shoot the victim.' " *Lloyd,* 354 N.C. at 90, 552 S.E.2d at 609 (citations omitted) (applying the doctrine of chances to admit evidence of two "accidental" shootings). One of defendant's main theories at trial was that Dorian Lanier's death was an accident, due to his voluntary consumption of turkey medication, rat poison and other toxic substances found around the farm.

Defendant argues the evidence regarding Johnny Ray Williams' death was not relevant because the circumstances of his death were completely dissimilar to those of Dorian Lanier's death. Dorian Lanier died after ingesting arsenic; Johnny Williams died by drowning. However, as the trial court found, both men were married to defendant at the time of their deaths; Johnny married defendant in 1989 and died 4 September 1991, while Dorian married defendant in 1993 and died 17 November 1997. Defendant contends both men died as the result of an accident; however, both men, after experiencing no major medical problems, suddenly and inexplicably became seriously ill while sharing a home with defendant. Both men experienced a change in personality, described by their respective friends and family members as being in a stupor or acting like a "zombie." When both men became ill, defendant diagnosed their medical problems and treated the men herself. Defendant attempted to isolate both men and generally refused to get them professional medical assistance on a regular basis. Finally, defendant reaped a substantial financial benefit from the untimely deaths of both her husbands.

Although the two men died from different causes, the circumstances surrounding Johnny Ray Williams' death are relevant to the argument that Dorian Lanier's death was not accidental, according to the "doctrine of chances." Our Supreme Court adopted the following explanation of the doctrine of chances:

> The recurrence or repetition of the act increases the likelihood of a mens rea or mind at fault. In isolation, it might be plausible that the defendant acted accidentally or innocently; a single act could easily be explained on that basis. However, in the context of other misdeeds, the defendant's act takes on an entirely different light. The fortuitous coincidence becomes too abnormal, bizarre, implausible, unusual, or objectively improbable to be believed. The coincidence becomes telling evidence of mens rea.

*State v. Stager,* 329 N.C. 278, 305, 406 S.E.2d 876, 891 (1991) (quoting Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 5:05

(1984)). The doctrine of chances is especially probative when the two crimes are similar in nature. *See Stager*, 329 N.C. 278, 406 S.E.2d 876; *State v. Boczkowski*, 130 N.C. App. 702, 504 S.E.2d 796 (1998) (applying the doctrine of chances to justify admission of evidence regarding two drowning deaths). However, the doctrine of chances has been applied even when the prior misdeed is not factually similar in all respects. *See State v. Murillo*, 349 N.C. 573, 509 S.E.2d 752 (1998) (evidence of husband's increasingly violent assaults on his wife relevant to show lack of accident in trial for her murder), *cert. denied*, 528 U.S. 838, 145 L. Ed. 2d 87 (1999); *State v. White*, 340 N.C. 264, 457 S.E.2d 841 (defendant's involvement in conspiracy to murder her husband was probative of lack of accident in trial for murder of stepson), *cert. denied*, 516 U.S. 994, 133 L. Ed. 2d 436 (1995) *State v. Taylor*, 154 N.C. App. 366, 572 S.E.2d 237 (2002) (defendant's threats to make the shooting of his first wife look like an accident relevant to show lack of accident in defendant's trial for shooting of second wife). Although Williams and Dorian Lanier died from different physical causes, their deaths shared sufficiently similar characteristics to provide some evidence that Dorian's death was not accidental.

Defendant also argues that the Williams evidence was too remote in time to be probative for any purpose. Our Supreme Court held:

> Remoteness in time between an uncharged crime and a charged crime is more significant when the evidence of the prior crime is introduced to show that both crimes arose out of a common scheme or plan. In contrast, remoteness in time is less significant when the prior conduct is used to show intent, motive, knowledge or lack of accident; remoteness in time generally affects only the weight to be given such evidence, not its admissibility.

*Stager*, 329 N.C. at 307, 406 S.E.2d at 893 (citations omitted). Here, Williams' death was separated from Dorian Lanier's death by approximately six years. After four years of marriage to defendant, Dorian died suddenly. The remoteness in time does not affect the probative value of the Williams evidence on absence of accident. The similarities between Dorian Lanier and Williams' deaths, as outlined by the trial court, are not less probative due to the passage of time. When considered in light of the doctrine of chances, we cannot hold that the Williams evidence is rendered inadmissible by its remoteness in time from Dorian's death.

The trial court also allowed admission of the Williams evidence as being probative of defendant's motive. "[T]he State may also intro-

duce [evidence of prior crimes] if it is relevant to establish a pattern of behavior on the part of the defendant tending to show that the defendant acted pursuant to a particular motive." *Stager*, 329 N.C. at 306-07, 406 S.E.2d at 892. Evidence of other crimes is admissible under Rule 404(b) if it "pertain[s] to the chain of events explaining the context, motive and set-up of the crime and form[s] an integral and natural part of an account of the crime . . . necessary to complete the story of the crime for the jury." *State v. Lloyd*, 354 N.C. 76, 90, 552 S.E.2d 596, 609 (2001) (quoting *State v. Agee*, 326 N.C. 542, 548, 391 S.E.2d 171, 174-75 (1990)). *See also State v. White*, 349 N.C. 535, 508 S.E.2d 253 (1998), *cert. denied*, 527 U.S. 1026, 144 L. Ed. 2d 779 (1999); *State v. Williams*, 156 N.C. App. 661, 577 S.E.2d 143 (2003); *State v. Willis*, 136 N.C. App. 820, 526 S.E.2d 191 (2000). Evidence of defendant's financial gain following the deaths of Johnny Williams and Dorian Lanier, standing alone, would provide a powerful motive for her involvement in their deaths. The evidence pertaining to Johnny Williams and Dorian Lanier's financial status, coupled with the mysterious illnesses of both men and the similarities between the two deaths, rendered the Williams evidence relevant to prove something other than defendant's propensity to commit murder.

For these reasons, we cannot say that the trial court abused its discretion in admitting the evidence regarding Johnny Ray Williams' death, his marriage to defendant, and their financial transactions before and after his death to show absence of accident in Dorian Lanier's death or a motive for defendant to commit his murder. The trial court also found, within its discretion, that the Williams evidence was not substantially more prejudicial than it was probative, rendering it admissible pursuant to Rule 403. Because the trial court did not abuse its discretion in admitting this evidence for proper purposes under Rule 404(b), we need not address defendant's arguments regarding the remaining purposes for which the trial court introduced this evidence.

II.

[2] Defendant also assigned error to the exclusion of evidence about the cause of Johnny Ray Williams' death. Defendant proffered evidence to show that Williams neither died from arsenic poisoning nor had high levels of arsenic in his body at the time of his death, in order to differentiate his death from that of Dorian Lanier. Defendant argues the exclusion of this evidence amounted to a denial of her constitutional rights to present a defense and confront the witnesses against her.

STATE v. LANIER

[165 N.C. App. 337 (2004)]

Persons accused of crimes are entitled by the North Carolina and United States constitutions to confront the witnesses against them and to present a defense. U.S. Const. Amend. VI, XIV; N.C. Const. Art. 1, §§ 19, 23. However, the trial court has control over the presentation of evidence and the scope of the testimony allowed during cross-examination. *See* N.C. Gen. Stat. § 8C-1, Rule 611(a) ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence. . . ."). "[A]lthough cross-examination is a matter of right, the scope of cross-examination is subject to appropriate control in the sound discretion of the court." *State v. Coffey,* 326 N.C. 268, 290, 389 S.E.2d 48, 61 (1990) (citing *State v. Hosey,* 318 N.C. 330, 348 S.E.2d 805 (1986)), *cert. denied,* 421 S.E.2d 360 (1992). "A witness may be cross-examined on any matter relevant to any issue in the case, including credibility." N.C. Gen. Stat. § 8C-1, Rule 611(b). "The range of facts that may be inquired into is virtually unlimited except by the general requirement of relevancy and the trial judge's discretionary power to keep the examination within reasonable bounds." *State v. Freeman,* 319 N.C. 609, 617, 356 S.E.2d 765, 769 (1987).

Following Dorian Lanier's death in November 1997, Johnny Williams' body was exhumed for an autopsy in January 1998. Defendant proffered this autopsy report evidence while cross-examining Dr. Garrett. Dr. Garrett did not refer to the 1998 autopsy during his direct examination by the State, nor did he perform the autopsy on Williams. The trial court did not allow the defense to offer the evidence during Dr. Garrett's cross-examination, but indicated that it would reconsider the ruling if defendant attempted to introduce the autopsy evidence during her case in chief. Such decisions regarding the subject matter allowed during cross-examination are within the sound discretion of the trial court, whose decisions will not be reversed upon appeal except upon a showing of an abuse of discretion. *See State v. Chavis,* 134 N.C. App. 546, 558, 518 S.E.2d 241, 250 (1999); *disc. rev. denied,* 351 N.C. 362, 542 S.E.2d 220 (2000).

Even if the exclusion of this evidence during Dr. Garrett's cross-examination had been error, the error would be harmless. Expert witness Dr. Page Hudson testified about the 1991 autopsy of Williams and defendant moved in limine to prevent Dr. Hudson from testifying about the 1998 autopsy or being examined concerning the presence of arsenic in Williams' body. "A defendant is not prejudiced by the granting of relief which he has sought or by error resulting from his own conduct." N.C. Gen. Stat. § 15A-1443(c) (2003). Defendant had

the opportunity to present the arsenic evidence during her case-in-chief, but chose to request its exclusion instead. Therefore, this assignment of error is overruled.

III.

**[3]** Defendant next contends the trial court erred in admitting evidence regarding a fire at the home defendant shared with Dorian Lanier on Ludie Brown Road (Ludie Brown house). Defendant argues this evidence was not relevant and was more prejudicial than probative, and therefore she should receive a new trial.

The evidence about which defendant complains tended to show that Jackie Hatcher and Dorian Lanier were working outdoors on Hatcher's property on 10 December 1996. Defendant called Hatcher's wife and told her the Ludie Brown house was on fire. Hatcher and Dorian arrived at the Ludie Brown house to find defendant alone in the house and the laundry room on fire. Hatcher and Dorian put the fire out, turned off the electrical circuit for the room, tore out the paneling and insulation, removed the washer and dryer from the house and wet down the cement floor of the laundry area. They returned to Hatcher's property and had lunch, only to learn the house was on fire again; when they returned, the house was burning badly.

After the fire, Dorian Lanier sold the Ludie Brown property for $55,000. Dorian and defendant received an insurance payment of $142,317.05 as a result of the destruction of their home, part of which they used to buy a new modular home for $88,733. Dorian told Hatcher the money from the land sale and insurance payment had gotten him out of a bind. Dorian said his feet would "be in salt water" as a result of the money, and he intended to enjoy life from that point on.

Initially, we note that although defendant objected to the presentation of this evidence during Jackie Hatcher's testimony, two witnesses had already testified concerning the fire without objection by defendant. These witnesses discussed the impact of the fire on the couple's finances, showing the benefits they received as a result of the fire. "[T]he admission of evidence without objection waives prior or subsequent objection to the admission of evidence of a similar character." *State v. Doisey*, 138 N.C. App. 620, 625, 532 S.E.2d 240, 244 (quoting *State v. Campbell*, 296 N.C. 394, 399, 250 S.E.2d 228, 231 (1979)), *disc. rev. denied*, 352 N.C. 678, 545 S.E.2d 434 (2000).

Therefore, defendant waived her objection to the admission of evidence concerning the financial impact of the fire.

The trial court admitted the Ludie Brown fire evidence to show motive, intent and plan. The evidence, in combination with other testimony that defendant was Dorian's sole beneficiary; that defendant had substantial prescription drug expenses and no insurance; that defendant wanted to move into a new home; that Dorian sold the Ludie Brown property for $55,000; that defendant sold Dorian's bulldozer for $15,000; and that defendant sold an option to purchase Dorian's real property for $225,000, creates a strong profit motive for defendant to kill her husband. The Ludie Brown fire evidence, along with the evidence of Johnny Ray Williams' death, strengthens the application of the doctrine of chances and lessens the probability that Dorian Lanier's death occurred as an accident. This evidence regarding the chain of events before Dorian Lanier's death "forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.' " *State v. Agee*, 326 N.C. 542, 548, 391 S.E.2d 171, 174 (1990) (citation omitted). Therefore this evidence was relevant to the issue of whether defendant committed the murder of her husband Dorian Lanier. The trial court determined that the relevance of the evidence outweighed its prejudicial effect; defendant has not shown that the trial court abused its discretion in making such a determination.

Finally, even if we determined this evidence was admitted in error, defendant has failed to show how its admission prejudiced her, given the voluminous amount of evidence and testimony presented during the trial. The erroneous admission of evidence requires a new trial only when the error is prejudicial. *See State v. Locklear*, 349 N.C. 118, 149, 505 S.E.2d 277, 295 (1998), *cert. denied*, 526 U.S. 1075, 143 L. Ed. 2d 559 (1999). Therefore, this assignment of error is overruled.

IV.

**[4]** Defendant also contends the trial court erred by allowing the State to impeach its witness, insurance agent Lester Wayne Anderson. The State conducted a voir dire examination of Anderson, then called him as a witness. His testimony tended to show that in spring 1991, defendant and Johnny Williams purchased life insurance on each other and for their children from Anderson. Anderson testified he did not witness Williams' signature on the policy application and barely knew him before selling him insurance. The State then presented evi-

dence that Anderson had indicated on the policy application in 1991 that he had witnessed Williams' signature and that he had known Williams for twenty years.

"The credibility of a witness may be attacked by any party, including the party calling him." N.C. Gen. Stat. § 8C-1, Rule 607. Impeachment of a party's own witness may allow a party to use impermissible hearsay as impeachment material in order to get the substance of the hearsay statement before the jury. *See State v. Hunt*, 324 N.C. 343, 349, 378 S.E.2d 754, 758 (1989); *State v. Bell*, 87 N.C. App. 626, 633, 362 S.E.2d 288, 292 (1987). In order to prevent abuse of Rule 607, impeachment should only be allowed when "[c]ircumstances indicating good faith and the absence of subterfuge" are present. *Hunt*, 324 N.C. at 350, 378 S.E.2d at 758. Several of these circumstances have been identified as when "the witness's testimony was extensive and vital to the government's case, that the party calling the witness was genuinely surprised by his reversal, or that the trial court followed the introduction of the statement with an effective limiting instruction." *Hunt*, 324 N.C. at 350, 378 S.E.2d at 758 (citation omitted). It is the better practice for a trial court to make findings of fact to indicate the presence of these circumstances before allowing impeachment of a witness by the party that called the witness. *See Bell*, 87 N.C. App. at 633, 362 S.E.2d at 292. However, the State may impeach a hostile witness by asking about prior inconsistent statements, if those questions are not a mere subterfuge for introducing improper and otherwise inadmissible evidence. *See State v. Price*, 118 N.C. App. 212, 216, 454 S.E.2d 820, 822-23, *disc. rev. denied*, 341 N.C. 423, 461 S.E.2d 766 (1995); *State v. Spinks*, 136 N.C. App. 153, 523 S.E.2d 129 (1999).

There is no indication that the State's impeachment of Anderson in this case was used as a mere subterfuge to present improper evidence to the jury. The State impeached Anderson's credibility by comparing his testimony to representations he made on the 1991 insurance application. The application for insurance had been admitted into evidence and Anderson had given most of his testimony before defendant objected to the State's impeachment of him. Thus, defendant waived any error. *See Doisey*, 138 N.C. App. at 625, 532 S.E.2d at 244 (citation omitted). This assignment of error is overruled.

V.

[5] Defendant argues the trial court committed reversible error when it failed to give defendant's requested jury instruction on

the theory of accidental death. Defendant requested that the trial court instruct the jury:

> Ladies and gentlemen of the jury, if Ivy Dorian Lanier died by accident or misadventure, that is, without wrongful purpose on the part of the defendant, the defendant would be not guilty. The burden of proving accident is not on the defendant. The assertion of accident is merely a denial that she has committed any crime. The burden remains at all times on the State to prove the defendant's guilt beyond a reasonable doubt.

> Ladies and gentlemen of the jury, I instruct you that the State of North Carolina has the burden of proving to you beyond a reasonable doubt that the death of Ivy Dorian Lanier was a homicide, that is, that the death of Ivy Dorian Lanier was not an accident. I instruct you that the mere fact that Ivy Dorian Lanier died on November 19, 1997, does not mean that a crime was committed.

> The defendant in this case has entered a plea of not guilty. She is not required to prove her innocence or to explain anything. The defendant does not have to prove that the death of Ivy Dorian Lanier was caused by an accidental exposure to or ingestion of arsenic. Rather, the State of North Carolina must prove to you beyond a reasonable doubt that the death of Ivy Dorian Lanier was not an accident.

> When a defendant asserts that the victim's death was a result of an accident, she is in effect denying the existence of those facts which the State must prove beyond a reasonable doubt to convict her of the crime of murder. Therefore, the burden remains at all times on the State to prove to the jury beyond a reasonable doubt those essential facts necessary to establish that a crime was committed, and in so doing, disprove beyond a reasonable doubt the defendant's contention of accidental death.

> I charge you, ladies and gentlemen of the jury, that the State of North Carolina must satisfy you beyond a reasonable doubt that the death of Ivy Dorian Lanier was not accidental.

The trial court instructed the jury as follows, in pertinent part:

> If the victim died by accident or misadventure, that is, without wrongful purpose or criminal negligence on the part of the defendant, the defendant would be not guilty. The burden of proving accident is not on the defendant. Her assertion of accident is

merely a denial she has committed any crime. In effect, she is denying the existence of those facts which the State must prove beyond a reasonable doubt to convict her of the crime of murder or any lesser included offenses about which you are instructed. The burden remains at all times on the State to prove the defendant's guilt beyond a reasonable doubt and that the victim's death was not accidental.

Defendant argues that instruction did not clearly inform the jury that the State was required to disprove accident beyond a reasonable doubt, and that such error, in turn, created constitutional and prejudicial error because the instruction lowered the State's burden of proof on an essential element of crime. Defendant also contends the trial court committed reversible error by failing to include accident in its final mandate to the jury.

Failure to instruct on each element of crime is prejudicial error requiring a new trial. *See State v. Bogle*, 324 N.C. 190, 376 S.E.2d 745 (1989). Prejudicial error is defined as a question of whether "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C. Gen. Stat. § 15A-1443(a) (2003).

In *State v. White*, the trial court instructed the jury that "[t]he burden remains on the State to prove the defendant's guilt beyond a reasonable doubt, thus that the death was not a result of accident or misadventure." *State v. White*, 340 N.C. 264, 300, 457 S.E.2d 841, 862 (1995). This instruction was held to be free from error. Defendant argues that *White* does not control the present case because *White* involved a review for plain error, whereas here we review for prejudicial error. The standard of review for plain error is higher than that for prejudicial error. *See State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993) (Plain error is error "so fundamental that it denied the defendant a fair trial and quite probably tilted the scales against him.").

Despite the different standards of review, the instruction given here and in *White* are almost identical. The *White* court held "[t]he substance of this instruction was accurate and free from error" and "instruct[ed] the jury on accident as a theory of acquittal." *White*, 340 N.C. at 300, 457 S.E.2d at 862. Here, the trial court's instruction on accident was also a correct statement of the law and contained the substance of the instruction defendant requested. Defendant has failed to show that, had the jury been instructed as

she suggested, there is a reasonable probability that the outcome of her trial would have been different. Accordingly, we overrule this assignment of error.

[6] Finally, defendant argues the indictment used here, the short-form murder indictment, failed to allege all of the elements of first degree murder, specifically murder by poison. Defendant argues that use of the short-form indictment violates her constitutional rights to due process.

The short form indictment is valid to charge first degree murder on any of the theories listed under N.C. Gen. Stat. § 14-17. *See State v. Braxton*, 352 N.C. 158, 174, 531 S.E.2d 428, 437 (2000), *cert. denied*, 531 U.S. 1130, 148 L. Ed 2d 797 (2001). The Supreme Court has upheld use of the short form indictment for first degree murder by premeditation and deliberation in light of the holding in *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311 (1999); *see State v. Wallace*, 351 N.C. 481, 508, 528 S.E.2d 326, 343, *cert. denied*, 531 U.S. 1018, 148 L. Ed. 2d 498 (2000), *reh'g denied*, 531 U.S. 1120, 148 L. Ed. 2d 784 (2001), and also for murder by lying in wait in *State v. Locklear*, 145 N.C. App. 447, 449, 551 S.E.2d 196, 197 (2001). We hold that the short form indictment is also sufficient to support a conviction for murder by poison under G.S. § 14-17. This assignment of error is overruled.

For the reasons stated above, we hold defendant received a fair trial, free from prejudicial error.

No error.

Judges HUNTER and THORNBURG concur.