An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-841

Filed 17 June 2026

Pender County, No. 22CR050877-700

STATE OF NORTH CAROLINA

      v.

DARRYL LEROY SMITH, Defendant.

Appeal by defendant from judgment entered 29 August 2024 by Judge Ricardo Jensen in Pender County Superior Court. Heard in the Court of Appeals 20 May 2026.

*Joseph P. Lattimore, for defendant-appellant.*

*Attorney General Jeff Jackson, by Assistant Attorney General Jadae K. Bridges, for State of North Carolina.*

FLOOD, Judge.

Defendant Darryl Leroy Smith appeals from his convictions of second degree forcible rape, sexual battery, and assault on a female. On appeal, Defendant argues the trial court plainly erred by, first, instructing the jury it could consider testimonial evidence of Defendant's assaults on other women to assess the issue of consent with A.C., the victim, and second, by allowing the lead detective to testify that Defendant made incriminating statements. Defendant also argues on appeal that he received

ineffective assistance of counsel ("IAC"). Upon careful review, we conclude the trial court did not plainly err by instructing the jury it could consider testimonial evidence of Defendant's assaults on other women to assess the issue of consent with A.C., or by allowing the lead detective to testify that Defendant made incriminating statements, because Defendant has failed to show that the jury probably would have returned a different verdict but for these errors. Additionally, we conclude Defendant did not receive IAC because he has not shown he was prejudiced by his counsel's failure to object to the detective's testimony.

## I. **Factual and Procedural Background**

On 29 August 2022, Defendant was indicted with second degree forcible rape, sexual battery, and assault on a female, and a trial was subsequently held. At trial, the State presented testimony from A.C., the victim; E.W., Defendant's ex-wife; Detective Stephen Clinard, the lead investigator; and Denise Riccobon, a sexual assault nurse examiner who conducted an exam of A.C.

### *A.C.'s Testimony*

In December 2020, Defendant and A.C. began a romantic relationship after meeting on a "dating app[,]" and a month later, Defendant moved into A.C.'s apartment in Wilmington, North Carolina. According to A.C., in February 2021, the two had a "big argument" after she discovered a pair of women's underwear in Defendant's duffel bag. A.C. testified that, during this argument, Defendant "push[ed] her] down on [her] bed, ripp[ed] off [her] underwear and [her] pants," and had

"nonconsensual sex" with her. Defendant left A.C.'s apartment that day, and A.C. "told him [she] never wanted to see him again." In later text messages between the two, Defendant wrote they were being "rough" like she liked, and A.C. responded that she "kept saying no[,]" and had been "trying to force [Defendant] off [her.]" The two resumed a relationship, however, after Defendant apologized and "said it would never happen again."

In April 2021, the two moved into a house in Burgaw, North Carolina. According to A.C., around three days after moving in, Defendant became upset that their moving boxes were not fully unpacked. A.C. testified that "he got in [her] face. He had pushed [her] up against the wall. He said that it was going to get done when he wanted it done."

Several months later, sometime at the end of July or beginning of August 2021, A.C. explained that the two got into an argument, which resulted in Defendant grabbing her arm and "leaving bruises[.]" During this altercation, law enforcement came to the house, but Defendant "asked [A.C.] to lie for him," saying it was a "misunderstanding" and Defendant promised to get help. In November 2021, the two had another dispute which, according to A.C., resulted in Defendant "push[ing her] off of the bed," A.C. hitting her head on wood paneling, and Defendant then "kicking [her] in the ribs" and "punching [her] in [her] face and in [her] ribs" while she was on the ground. A.C. testified that, while she was crying, Defendant "asked [her] what [she] was crying for because the last person got it worse than [she] did." A.C. was in

pain, but Defendant did not allow A.C. to see a doctor until several days later when she promised she would say she "fell in the bathtub."

Nearly six months later, in April 2022, Defendant unilaterally decided he "no longer wanted to be in a relationship[,]" and that he would make plans to move out. During this period, Defendant would stay with someone else, sleep on the couch at the shared home in Burgaw, or sleep in bed with A.C. A.C. testified that the two had consensual intercourse "[m]aybe once every other week."

On 26 June 2022, A.C. returned home from a beach trip, and Defendant showed up at the Burgaw house. When A.C. asked why he had come, Defendant responded that "he could come here any time he wanted to." As the two were talking, Defendant explained he would be "out on the 1st of July and that it was gonna be done." A.C. stated she "told him that he would never have [her] again[,]" and Defendant eventually said "he could have [her] anytime that he wanted to." According to A.C., he then "pushed [her] over the bed[,]" "lifted up [her] nightgown[,]" and had nonconsensual intercourse with her. A.C. testified that, during this time, she was "screaming and crying and saying no." A.C. testified that she "scream[ed] for him to get out of the house, to leave [her] alone, to get away from [her]." A.C. explained that, after Defendant left, he kept calling and texting, "saying he was sorry." A.C. reported this incident to law enforcement the next day.

Defendant and A.C. texted after the incident, which included Defendant writing, "I've apologized nd [sic] told u I seriously ddnt [sic] know the difference . . .

I'm ashamed it happened but to tell someone." He asked her if she went to the "cops," admitted he was scared, and stated that he would "turn [him]self in[.]"

*E.W.'s Testimony*

Defendant's ex-wife E.W. testified to several displays of Defendant's previous violence towards her during their relationship. E.W. explained that Defendant's "true colors slowly started to appear" after six months of being together. She observed that he "had a very hard time controlling his anger[,]" and he was "controlling and very jealous." She testified as to one incident that occurred in May 2017 when Defendant "spit in [her] face[,]" pushed her, choked her, and punched her "through [a] pillow like on [her] head where you can't see if [she] bruise[s]." E.W. testified that she was able to get away and call 9-1-1.

She then testified that, around February 2019, Defendant saw messages from another man on E.W.'s phone and proceeded to "choke[]" her. E.W. explained Defendant then grabbed a knife, put "it to [her] eye[,]" and said he "would kill" her before she left him. E.W., however, was again able to get away and call 9-1-1, resulting in Defendant going to jail that night.

Finally, E.W. testified about one last incident in August 2020. She had allowed Defendant to watch their children while she went out with friends to celebrate her birthday. E.W. recalled that Defendant kept "texting me and calling me" to the point where she returned home early. She testified that, when she arrived home, Defendant told her he wanted "to have sex" with her, but she told him no. Defendant then tried

to pull E.W.'s sweatpants down, but when he could not get them off, "he still attempt[ed] to stroke and stab [her] vagina through [her] sweatpants." She testified she was crying the "whole time . . . telling him no, stop."

### Detective Clinard's Testimony

The State also introduced testimony from Detective Clinard, who explained he had worked "as a special victims unit investigator for the past [ten] years." Detective Clinard testified that he read the text messages between A.C. and Defendant regarding the 26 June 2022 incident, and "what [he] read into it, [were] some -- no denials -- what [he] felt were incriminating comments that [Defendant] had made to [A.C.]" Detective Clinard explained that, since A.C. and Defendant were texting about the incident when A.C. arrived at his office, Detective Clinard requested that A.C. make a "pretext phone call" with Defendant. A "pretext phone call[,]" as explained by Detective Clinard, is when a suspect "thinks he's texting and talking to the victim when actually he's either talking to me or he's talking to me and the victim at that particular time[,]" and law enforcement does this "to see if he will make an admission." Detective Clinard further explained, "[y]ou can admit without admitting that you've done something wrong," for example "they may not say, yeah, I'm sorry I did that to you. But he may not reply to that specifically but it'll be an admission by omission. . . . [T]hey may respond with don't go to the cops. That to me is an incriminating statement if you're worried about law enforcement."

Regarding the pretext phone call, Detective Clinard testified that Defendant

"never denies it. He makes several incriminating statements. One of which, I believe, was . . . he wants her to stop talking about it." Detective Clinard explained that he considered several of the comments to be "very soft admissions. In other words, [Defendant] doesn't say, yeah, I know. I raped you. Sorry. But he apologizes multiple times in that interview. I'm sorry. I'm sorry." Detective Clinard stated that "[a]bout the only denial, I think, he makes on that recording is when she says that she was screaming for him to stop, I think, he makes the comment that you weren't screaming or something along those lines." Detective Clinard explained he eventually consulted with "the District Attorney's Office, which I do in all of these cases to get them on board, to explain to them what I've got, and basically get an agreement that, you know, we have enough." At no point did defense counsel object to this testimony.

*Nurse Riccobon's Testimony*

Nurse Riccobon, who was tendered as an "expert in the field of emergency medicine and sexual assault nurse examinations[,]" testified as to her examination of A.C. the day after the alleged rape. On direct examination, Nurse Riccobon testified that she observed injuries to A.C.'s vagina that were "consistent with what she reported[,]" but on cross examination, she admitted that A.C.'s consensual sex with Defendant a few days earlier "might have possib[ly]" had an impact on the existence of the injuries. Additionally, Nurse Riccobon testified that A.C. explained to her that Defendant "pushed [her] back over [the bed] and was holding [her] down by the shoulder." Nurse Riccobon photographed A.C.'s shoulder and noted there was "skin

discoloration and possible injury."

*Defendant's Testimony*

After the State rested, Defendant testified on his own behalf. During his testimony, Defendant explained that the incident of 26 June 2022 had been consensual. According to Defendant, on 26 June 2022, after A.C. came home, they had a talk, and when he went to leave, A.C. "jumped in front of the door." Defendant stated that A.C. was asking him why he could not "[b]e the man [she] need[ed,]" and Defendant responded "it's not you, it's me. You know why. You're doing whatever. I need to leave because you know why and we already discussed this." Defendant testified that A.C. then "went for [his] belt buckle[,]" and so he "grabbed her arm and [] push[ed] her onto the bed." He explained he then "tried to run away," but "she came and she grabbed" him.

Defendant testified that they then "sat down" and talked. According to Defendant, he "had drank one drink to calm down, relax, whatever the case may be[,]" and A.C. "was already previously drinking from the beach that day." Defendant said "we finally came to the conclusion or whatever the case may be and we had sex. We just naturally went into having sex." Defendant claimed A.C. never said no or screamed. Afterwards, Defendant claimed A.C. "said you really don't care about me . . . pussy is pussy to you[,]" to which he reportedly responded, "I told you it's not gonna make a difference. I mean it is what it is." According to Defendant, "that's when the whole allegation of you took advantage of me, and this, that," took place, and "I was

like you know that's not me. I would never do that." Defendant denied ever raping A.C., and when asked at trial why he had apologized after, he testified that "[f]or even . . . bringing it up to remind her that that happened. Like I said, I knew of incidents or [an] incident of what happened in her past with her ex-husband." When asked about the text messages, Defendant explained, "I don't feel bad for us having sex. I felt bad how she played that out to be what she thought it was."

### E.B.'s Testimony

Defense counsel then presented testimony from E.B. E.B. explained she had been Defendant's caregiver for the Veterans Administration, and they "became friends over time[,]" including forming a physical relationship. On direct examination, she testified that Defendant "has made really bad decisions before as far as abuse. But I don't believe he would ever rape somebody." On cross examination, E.B. admitted to several physical abuse altercations that had occurred between Defendant and E.B. but did not testify as to any forms of rape or sexual assault.

### Jury Instructions

After the close of all evidence and the trial court's denial of Defendant's motion to dismiss, the trial court instructed the jury. Regarding E.W.'s and E.B.'s testimony, the trial court instructed the jury, in relevant part:

> This evidence was received solely for the purpose of showing that the defendant had a motive for the commission of the crime charged in this case. That the defendant had the intent which is a necessary element of the crime charged in this case. That the defendant had the

> knowledge which is a necessary element of the crime
> charged in this case. That there existed in the mind of the
> defendant a plan, scheme, system, or design involving the
> crime charged in this case. That the defendant had the
> opportunity to commit the crime. The absence of mistake.
> The absence of accident. The context and chain of events
> with regard to the relationship of [A.C.] and [E.W.] with
> [Defendant]. And [A.C.'s] state of mind. If you believe this
> evidence, you may consider it but only for the limited
> purpose for which it was received. You may not consider it
> for any other purpose.

Defense counsel did not object to this instruction. The jury subsequently returned guilty verdicts against Defendant on all charges. The trial court sentenced Defendant to 73 to 148 months of imprisonment. Defendant timely appealed.

## II. **Jurisdiction**

This Court has jurisdiction over an appeal from a final judgment in a criminal case from a superior court pursuant to N.C.G.S. §§ 7A-27(b) and 15A-1444(a) (2023).

## III. **Analysis**

On appeal, Defendant argues the trial court (A) plainly erred by instructing the jury it could consider the evidence of Defendant's assaults on other women to assess the issue of consent with A.C., and (B) plainly erred by allowing Detective Clinard to testify that Defendant made incriminating statements. Additionally, Defendant argues (C) he received IAC. We address each argument in turn.

### A. Jury Instruction

Defendant first argues on appeal that the trial court plainly erred by instructing the jury it could consider the evidence of Defendant's assaults on other

women to assess the issue of consent with A.C. Specifically, Defendant contends (1) "the jury could not use the evidence to establish [A.C.'s] state of mind[,]" and (2) that "the incidents involving [E.B.] could not be considered part of a 'common scheme and modus operandi' for sexual gratification, as there was no sexual component whatsoever to those incidents." We disagree.

Where a party fails to object to a jury instruction, the party's claim regarding that instruction is unpreserved for appellate review and is thus subject to plain error review. *See State v. Gillard*, 386 N.C. 797, 828 (2024). "The plain error rule is always to be applied cautiously and only in the exceptional case . . . ." *State v. Odom*, 307 N.C. 655, 660 (1983) (citation modified). "[I]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *Id.* at 661 (citation omitted).

Under the plain error rule, the defendant must show three things:

> First, the defendant must show that a fundamental error occurred at trial. Second, the defendant must show that the error had a probable impact on the outcome, meaning that absent the error, the jury probably would have returned a different verdict. Finally, the defendant must show that the error is an exceptional case that warrants plain error review, typically by showing that the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Gillard*, 386 N.C. at 820 (citation omitted). "To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty."

*State v. Lawrence*, 365 N.C. 506, 518 (2012) (citation and internal quotation marks omitted); *see also State v. Maready*, 362 N.C. 614, 621 (2008) ("In deciding whether a defect in the jury instruction constitutes 'plain error,' the appellate court must examine the entire record and determine if the instructional error had a probable impact on the jury's finding of guilt."). Thus, plain error should be found only where the claimed error is "something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where the error is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial." *State v. Ball*, 292 N.C. App. 151, 160 (2024) (citation omitted).

According to North Carolina Evidence Rule 404(b),

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (2023). Our Supreme Court has explained that this rule is "a clear general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 278–79 (1990). In other words, "[t]he list of permissible purposes for admission of

'other crimes' evidence is not exclusive, and such evidence is admissible as long as it is relevant to any fact or issue other than the defendant's propensity to commit the crime." *State v. Hipps*, 348 N.C. 377, 404 (1998). "In each case, the burden is on the defendant to show that there was no proper purpose for which the evidence could be admitted." *State v. Lanier*, 165 N.C. App. 337, 345 (2004) (citation omitted).

### 1. A.C.'s State of Mind Purpose

Defendant first argues that the trial court plainly erred by instructing the jury that E.W.'s testimony could be used for the purpose of considering A.C.'s state of mind, where there was "no evidence that [A.C.] was aware of the specific incidents where [Defendant] allegedly struck, choked[,] and 'attempted to engage in nonconsensual intercourse with [E.W.]'"

Our courts have explained that, "[i]n sex [offense] cases, the victim's state of mind can be relevant[,]" *State v. Thompson,* 139 N.C. App. 299, 305, (2000), and "[w]hen it is relevant, any evidence tending to show the victim is afraid of [the defendant], or evidence explaining why the victim never reported the sexual incidents to anyone, is admissible[,]" *State v. Foust*, 220 N.C. App. 63, 69–70 (2012); *see also State v. Young,* 317 N.C. 396, 413 (1986) ("[E]vidence of a victim's awareness of prior crimes allegedly committed by the defendant may be admitted to show that the victim's will had been overcome by her fears for her safety where the offense in question requires proof of lack of consent or that the offense was committed against the will of the victim.").

Here, A.C. testified that, prior to the 26 June 2022 incident, Defendant had told her "the last person got it worse than [she] did." Although there is no evidence that A.C. was aware of the *specific* details of involving Defendant's abuse towards E.W., Defendant had made A.C. aware that such acts had occurred. Assuming without deciding that there was error in the trial court's instruction, our review of the Record in this case reveals that any such error did not amount to plain error as Defendant has failed to show that, without that instruction, the jury "probably would have returned a different verdict[.]" *See Gillard*, 386 N.C. at 820; *see also State v. Reber*, 386 N.C. 153, 162 (2024) ("[T]he question on plain error is not whether the challenged evidence increased the likelihood of the jury reaching the same verdict. It examines the opposite question—whether, absent that evidence, the jury probably would have returned a different verdict."). Here, the jury could rely on other testimony as to A.C.'s state of mind as A.C. testified that she was "screaming and crying and saying no" during the incident. Further, the State presented evidence of Nurse Riccobon's testimony that A.C.'s vaginal injuries were consistent with A.C.'s report, and presented evidence of the text messages from Defendant apologizing after the incident, saying he "ddnt [sic] know the difference" and was "ashamed it happened[,]" and claiming he would "turn [him]self in[.]" Thus, we conclude the trial court did not plainly err by instructing the jury that E.W.'s testimony could also be used for the purpose of considering A.C.'s state of mind.

Defendant also argues that the jury's use of E.B.'s testimony should have been limited from being used for the purpose of A.C.'s state of mind where E.B. testified as to events *after* the 26 June 2022 incident. Again, Defendant has failed to show that absent this instruction, the jury "probably would have returned a different verdict[,]" *see Gillard*, 386 N.C. at 820, where the jury heard A.C. testify to her state of mind in that she was "screaming and crying and saying no[,]" and the State presented evidence of Nurse Riccobon's testimony that A.C.'s vaginal injuries were consistent with her report. Further, the jury saw the text messages from Defendant apologizing after the incident, saying he "ddnt [sic] know the difference" and was "ashamed it happened[.]" Thus, we conclude the trial court did not plainly err by instructing the jury that E.B.'s testimony could also be used for the purpose of considering A.C.'s state of mind.

### 2. E.B.'s Testimony and Common Scheme Purpose

Defendant next argues the trial court plainly erred by instructing the jury that E.B.'s testimony could also be used for the purpose of whether Defendant has a "plan, scheme, system, or design involving the crime charged" since "the incidents involving [E.B.] could not be considered part of a 'common scheme and modus operandi' for sexual gratification, as there was no sexual component whatsoever to those incidents." Here, the trial court instructed the jury that one of the purposes for allowing E.W.'s and E.B.'s testimonies for consideration of whether Defendant had "a plan, scheme, system, or design involving the crime charged[.]" Similar to the

reasoning above, however, Defendant has failed to show that the jury "probably would have returned a different verdict" if the trial court had properly limited this portion of the jury instruction to exclude E.B.'s testimony as to this purpose. *See Gillard*, 386 N.C. at 820. Thus, we conclude the trial court did not plainly err by instructing the jury that E.B.'s testimony could also be used for the purpose of considering whether Defendant had a "a plan, scheme, system, or design involving the crime charged[.]"

## B. Improper Opinion Testimony

Defendant next argues on appeal that the trial court plainly erred by allowing Detective Clinard to testify that he believed Defendant made incriminating statements during the recorded phone call and text messages. We disagree.

This Court ordinarily "review[s] a trial court's ruling on the admissibility of lay opinion testimony for abuse of discretion." *State v. Belk*, 201 N.C. App. 412, 417 (2009). Defendant, however, did not object to Detective Clinard's testimony; thus, Defendant has failed to preserve this issue for appellate review. *See Reber*, 386 N.C. at 157 ("Without an objection, that error is deemed unpreserved, and the issue is therefore waived on appeal." (citing to *Lawrence*, 365 N.C. at 512)). "[T]his Court reviews unpreserved evidentiary objections for plain error." *State v. Thompson*, 273 N.C. App. 686, 690 (2020).

North Carolina Rule of Evidence 701 governs lay opinion testimony. Rule 701 provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

N.C.G.S. § 8C-1, Rule 701 (2023). "Generally, opinion evidence of a non-expert witness is inadmissible because it tends to invade the province of the jury." *State v. Malone-Bullock*, 278 N.C. App. 736, 740 (2021) (citation and internal quotation marks omitted). On the other hand, a lay witness may testify to an opinion that is "a shorthand statement of fact, or, in other words, the instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time." *Id.* at 740–41. Our courts have held that it is error for law enforcement officers to testify as to whether they believe a defendant is guilty. *See State v. Carrillo*, 164 N.C. App. 204, 209–10 (2004) (holding that the trial court erred in "allowing the officers to offer their opinions of whether [the] defendant was guilty" of trafficking cocaine where the officer testified "I think your client knew what was in that package"); *State v. Elkins*, 210 N.C. App. 110, 126 (2011) (holding an officer's testimony that "I felt like I was building a solid case. [The defendant] was, indeed, the offender in this case[,]" was improper lay opinion testimony).

Unlike the officers in *Carrillo* and *Elkins*, however, Detective Clinard did not explicitly opine here that Defendant is guilty, but rather testified that Defendant

"makes several incriminating statements" about the 26 June 2022 incident. Detective Clinard stated Defendant provided "very soft admissions[,]" and explained Defendant "doesn't say, yeah, I know. I raped you. Sorry. But he apologizes multiple times in that interview[.]"

Assuming *arguendo*, however, that allowing this testimony was error, we conclude it does not rise to the level of plain error. *See Elkins*, 210 N.C. App. at 126 (holding that although the officer's testimony was error, it did not rise to the level of plain error where there was "plenary evidence incriminating" the defendant). We cannot conclude that, "absent the error, the jury probably would have reached a different result," *see id.*,  where the plenary evidence includes A.C.'s testimony about the 26 June 2022 incident; Nurse Riccobon's testimony that A.C.'s vaginal injuries were consistent with her report and that A.C. had a possible injury to her shoulder; Defendant's testimony admitting that he did push A.C. down on the bed on 26 June 2022; and the text messages from Defendant saying he "ddnt [sic] know the difference[,]" was "ashamed it happened[,]" and that he would "turn [him]self in[.]" Accordingly, we conclude Defendant has failed to show that the jury "probably would have returned a different verdict[.]" *See Gillard*, 386 N.C. at 820.

## C. Ineffective Assistance of Counsel

Defendant finally argues he received IAC "for the failure to object to Detective Clinard's offending comments." We disagree.

Whether a defendant received IAC at trial is a question of law reviewable de novo. *State v. Wilson*, 236 N.C. App. 472, 475 (2014). "Under a *de novo* review, [this] [C]ourt considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Biber*, 365 N.C. 162, 168 (2011) (citation omitted).

The United States Supreme Court has set forth a two-pronged test for determining whether a defendant received IAC:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate prejudice, a defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Additionally, "there is no reason for a court deciding an [IAC] claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

As explained above, even if the trial court had struck Detective Clinard's testimony, the State's remaining evidence was such that the trial court did not plainly err in allowing the allegedly erroneous portion of Detective Clinard's testimony. Had Defendant's counsel objected to Detective Clinard's testimony, the result of the

proceeding would have been the same. *See id.* at 694. Thus, Defendant was not prejudiced and did not receive IAC. Accordingly, we dismiss Defendant's IAC claim.

## IV. <u>Conclusion</u>

Upon careful review, we conclude the trial court did not plainly err by instructing the jury it could consider testimony evidence of Defendant's assaults on other women to assess the issue of consent with A.C., or by allowing the lead detective to testify that Defendant made incriminating statements, where Defendant has failed to show that the jury probably would have returned a different verdict but for these errors. Additionally, we conclude Defendant did not receive IAC where he has failed to show he was prejudiced by his counsel's failure to object to the detective's testimony.

NO PLAIN ERROR IN PART AND DISMISSED IN PART.

Judges COLLINS and WOOD concur.

Report per Rule 30(e).